UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Tiffany Amanda Thompson,

       Plaintiff,

       v.                               Civil Action No. 5:13-cv-275-cr-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.

## REPORT AND RECOMMENDATION
(Docs. 11, 14)

Plaintiff Tiffany Amanda Thompson brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB"), Supplemental Security Income ("SSI"), and Child Disability Benefits ("CDB")[1].  Pending before the Court are Thompson's motion to reverse the Commissioner's decision (Doc. 11) and the Commissioner's motion to affirm the decision (Doc. 14).  For the reasons stated below, I recommend that Thompson's motion be DENIED and the Commissioner's motion be GRANTED.

---

[1] 20 C.F.R. § 404.350(a)(5) provides as follows: "You are entitled to child's benefits on the earnings record of an insured person who is entitled to old-age or disability benefits or who has died if-- . . . you are 18 years old or older and have a disability that began before you became 22 years old."

## Background

Thompson alleges disability beginning on June 26, 1987, her date of birth.  She left school in the ninth grade and thereafter obtained a GED.  She had a difficult childhood with inconsistent parenting.  Her mother was incarcerated when she was in the seventh or eighth grade, and Thompson was incarcerated from around July 2005 through July 2006 for selling drugs.  While on probation, she had a violation for fighting, resulting in her return to prison from approximately October until November 2008.  She has worked as a fast-food worker, a housekeeper, a flower picker, a cashier, and a telemarketer; but none of these jobs lasted more than six months.  On the date of the administrative hearing in January 2012, she was living in a house with her boyfriend.

Since at least 2007, Thompson has had problems with anxiety and violent behavior.  She has variably been diagnosed with anxiety disorder with panic attacks, posttraumatic stress disorder ("PTSD"), depression, agoraphobia, adjustment disorder, personality disorder, alcohol use disorder, and opioid dependence.  She has also suffered from cellulitis, an infection in the eye, causing the eye to swell up and impair her vision.  At the administrative hearing, Thompson testified that she has several panic attacks a day, each lasting between five and ten minutes, on average.  (AR 62–63, 74–75.)  She further testified that she gets upset over little things; has frequent arguments and outbursts with family members and others; lacks motivation; and has difficulty concentrating, remembering, keeping appointments, and completing tasks.  (AR 43–46, 59, 63, 65.)  On a typical day, Thompson stays home and sleeps a lot.  (AR 70.)  She gets up at 11 a.m. or later, watches television, snacks, and talks on the telephone with her

mother or boyfriend.  (*Id.*)  Her mother or her boyfriend's mother may come over to help with household cleaning, and once a week she goes for a ride in the car to get some air. (*Id.*)  Thompson stated that she never goes out to dinner or to the movies; she does not shop; and when she and her boyfriend traveled to Florida for a week in January 2011, she was anxious and would not go outside.  (AR 72–73.)

In January 2010, Thompson filed applications for DIB, SSI, and CDB, alleging disability as of her birthdate, June 26, 1987.  (AR 198–212.)  In a Disability Report form, she reported that she has been unable to work due to PTSD, depression, social phobia, agoraphobia, bipolar disorder, and severe generalized anxiety.  (AR 246.)  She claims that she has anxiety when she is around people, fear that her mother is going to die, dependency on others, loss of interest, mood swings, racing thoughts, fatigue, anger outbursts, difficulty sleeping, forgetfulness, poor concentration, and crying spells.  (*See, e.g.*, AR 59–64, 473–74, 605.)  Thompson's applications were denied initially and upon reconsideration, and she timely requested an administrative hearing.

The hearing was conducted on January 10, 2012 by Administrative Law Judge ("ALJ") Paul Martin.  (AR 34–84.)  Thompson appeared and testified, and was represented by a non-attorney representative.  Thompson's mother and a vocational expert ("VE") also testified at the hearing.  On February 24, 2012, the ALJ issued a decision finding that Thompson was not disabled under the Social Security Act at any time prior to June 25, 2009, the date she attained age 22, through the date of the decision. (AR 17–28.)  Thereafter, the Appeals Council denied Thompson's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–6.)  Having

exhausted her administrative remedies, Thompson filed the Complaint in this action on October 11, 2013.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

4

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Thompson had not engaged in substantial gainful activity since her alleged onset date of June 26, 1987.  (AR 20.)  At step two, the ALJ found that Thompson had the following severe impairments: "a bipolar disorder, [PTSD], an anxiety disorder with social phobia, and a narcissistic and avoidant personality disorder."  (*Id.*)  Conversely, the ALJ found that Thompson's cellulitis in the eyes was non-severe, given that it did not cause any significant functional limitations for a vocationally relevant period of time.  (AR 21.)  At step three, the ALJ found that none of Thompson's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 21–22.)  Next, the ALJ determined that Thompson had the RFC to perform the full range of work at all exertional levels, with the following nonexertional limitations:

> [S]he can understand, remember, and carry out one[-] to three[-]step instructions; she can maintain concentration, persistence, and pace for two[-]hour periods in a calm, predictable, and routine workplace with occasional supervision; she must avoid working with the public; she must work in a predictable and structured setting; she must generally work by herself, but she may have task interactions with co[]workers several times per day and she can check[] in with supervisors at the beginning and end of her workday; she can make simple work[-]related decisions; and due to her alleged panic attacks, she would need to be off[] task two to three times per

5

day by herself [for] between two and fifteen minutes, after which she could resume work.

(AR 22.)  Given this RFC, and based on testimony from the VE, the ALJ found that Thompson was capable of performing her past relevant work as a housekeeper.  (AR 26–27.)  The ALJ concluded that Thompson had not been under a disability at any time prior to June 25, 2009, the date she attained the age of 22, through the date of the decision. (AR 27.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Thompson claims the ALJ failed to properly evaluate the medical opinions. She further contends the ALJ's RFC determination, credibility assessment, and step-four finding that Thompson could perform her past relevant work as a housekeeper are not supported by substantial evidence. In response, the Commissioner asserts that substantial evidence supports the ALJ's RFC determination, credibility assessment, and finding that Thompson could perform her past relevant work; and that the ALJ and Appeals Council properly considered the medical opinions. As discussed below, I agree with the Commissioner and therefore recommend granting the Commissioner's motion and denying Thompson's motion.

I.      **The ALJ's credibility assessment is supported by substantial evidence.**

Pivotal to the ALJ's decision is the ALJ's assessment of Thompson's credibility. The ALJ found that, although Thompson's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Thompson's statements concerning the intensity, persistence, and limiting effects of those symptoms "are not credible to the extent they are inconsistent with the [ALJ's RFC determination]."  (AR 23.)  It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant," *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted), and the court "must show special deference" to credibility determinations made by the ALJ, "who had the opportunity to observe the witnesses' demeanor" while testifying, *Yellow Freight Sys. Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994).  If the ALJ's credibility assessment is supported by substantial evidence, the court must uphold it, even if substantial evidence supporting the claimant's position also exists.  *Aponte*, 728 F.2d at 591; *see Alston*, 904 F.2d at 126 ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) ("[W]e will defer to [the agency's credibility] determinations as long as they are supported by substantial evidence.").

The regulations prescribe a specific process that an ALJ must follow in weighing a claimant's testimony.  The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b).  If the ALJ finds such an impairment, the ALJ

evaluates the intensity and persistence of its symptoms to determine how they limit the claimant's functioning.  20 C.F.R. §§ 404.1529(c), 416.929(c).  A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms.  *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations of the impairment, then the ALJ must consider additional factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken by the claimant to relieve the symptoms; (5) other treatment received; and (6) any other measures taken to relieve the symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)–(vi), 416.929(c)(3)(i)–(vi).  After considering the claimant's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  *Martone v. Apfel*, 70 F. Supp. 2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  But a "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988).  Social Security Ruling 96-7p provides:  "When evaluating the credibility of an individual's statements, the [ALJ] must consider the entire case record and give

specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

Here, in assessing Thompson's credibility, the ALJ considered the entire record, applied the relevant regulatory factors, and explained his decision with sufficient specificity to allow meaningful review.  Acknowledging Thompson's allegations that she experiences severe anxiety, chronic daily panic attacks, interpersonal problems, and other mental impairments (AR 23–25), the ALJ noted the following evidence/factors which "undermine her credibility" (AR 25): (1) there is "very little treatment history of record," with Thompson seeking treatment only "sporadic[ally]" (AR 23); (2) Thompson has "demonstrated a pattern of not following through with therapy and prescribed medication changes" (*id.*); (3) the record contains "very little objective medical support" for Thompson's claims, particularly her claims regarding panic attacks (AR 24); and (4) Thompson's daily activities—including working on her new house, doing paperwork for her boyfriend, taking a trip to Florida, and engaging in work activity—do not support the level of limitation alleged by Thompson (AR 25).

Substantial evidence supports the ALJ's findings.  First, Thompson's history of treatment for her mental impairments was in fact limited and sporadic, and she frequently missed appointments and did not comply with treatment recommendations.  Although she alleges disability as of 1987, her earliest mental health treatment records date back to only January 2007, when she began treating at Clara Martin Center ("CMC") after her release from prison.  (AR 338–51.)  This treatment ended in January 2008 (AR 335–37), and she does not appear to have treated with another mental health provider until

approximately one year later when she saw Dr. Douglas Southworth in February 2009.

(AR 445.)  At that appointment, Dr. Southworth discussed medication choices with

Thompson, and recommended cognitive behavioral psychotherapy.  (*Id.*)  But Thompson

failed to seek further mental health treatment until about ten months later when she saw

Victoria Wilk, APRN, in December 2009.  (AR 433.)  Thompson treated with Nurse

Wilk on only three occasions between December 2009 and November 2010.  (AR 431–

34, 509–10.)  Between November 2010 and September 2011, Thompson treated with Dr.

Holliday Rayfield, who repeatedly advised Thompson to pursue therapy and noted her

failure to attend appointments and comply with treatment recommendations.  (AR 585

(November 2010: "not seeing therapist," "last therapist- a few years ago," "is adamant in

her refusal to do therapy at this time" but agreed to consider it once medications

stabilized), 582 (February 2011: "not seeing therapist," "must start seeing . . . therapist,"

"absolutely needs to be in therapy"), 562 (May 2011: "she left before we could finish

discussing [what medications to prescribe,] as the app[ointment] was running late and she

kept getting calls/texts"), 563 (May 2011: "not seeing therapist," "must start seeing . . .

therapist"), 559 (September 2011: "discussion of No Shows," "seems to have difficulty

with organization and follow-through regarding app[ointments] and treatment plans,"

"still has not engaged in therapy, a key component of the overall treatment approach,"

"we have tried several times to help with referrals, and will continue to do so . . . , but it

is up to [Thompson] to follow through and continue to make calls to get app[ointments]

set up"), 560 (September 2011: "continues to seek out treatment at the same time

rejecting treatment options"); *see also* AR 505, 575, 579–80, 610.)  It was not until

11

October 2011, almost three years after Dr. Southworth recommended therapy and only around four months before the ALJ issued the decision in this case, that Thompson began attending regular therapy with Heather Findlay, LCMHC.  (AR 605–07.)

The record indicates that Thompson failed to attend therapy because it was not helpful to her, and she had difficulty leaving the house to make it to appointments.  (*See* AR 431, 559, 582, 610–11.)  At the administrative hearing, Thompson testified that she missed one therapy appointment with counselor Findlay due to problems finding transportation.  (68–69.)  The ALJ considered this evidence, but stated:  "While records reflect some issues with organization or claims that it is too hard to leave her house and make appointments, even her treating psychiatrist [Dr.] Rayfield . . . , has noted [Thompson's] reluctance to treatment."  (AR 23–24 (citations omitted).)  It was not improper for the ALJ to consider the frequency and consistency of Thompson's treatment and whether Thompson complied with treatment recommendations in an effort to mitigate the effects of her mental impairments.  The regulations state:  "If you do not follow the prescribed treatment without a good reason, we will not find you disabled."  20 C.F.R. § 404.1530(b).  And the Social Security Administration has determined that a claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  SSR 96-7p, 1996 WL 374186, at *7; *see* 20 C.F.R. § 404.1529(c)(3)(iv) and (v); *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001); *Mezzacappa v. Astrue*, 749 F. Supp. 2d 192, 209 n.14 (S.D.N.Y. 2010).

Substantial evidence also supports the ALJ's finding that, "[i]n the limited mental health records available, [Thompson's] clinical picture often does not support her subjective degree of limitations."  (AR 24.)  As noted by the ALJ, there are no prison medical records documenting mental health problems while Thompson was incarcerated for one year in 2005 and 2006 and for one month in 2008.  (*Id.* (citing AR 365–87).)  A January 2007 initial assessment from CMC indicates that, on a scale of 1 to 5—1 indicating "no prob[lems]," 2 indicating "slight prob[lems]," and 5 indicating "extreme prob[lems]"—Thompson's mental health problems ranked at only a "2."[2]  (AR 340.)  The records from CMC consistently describe Thompson as stable and doing relatively well overall.  For example, May 2007 progress notes indicate that Thompson was continuing to function in a healthy manner, was working at two jobs both of which she enjoyed, and was preparing to move into a new apartment with her mother.  (AR 359–60.)  An August 2007 note states that Thompson was "doing well," was "very happy [with her] new job," and was looking for an apartment with her boyfriend.  (AR 356.)  A September 2007 note states that, although Thompson was "anxious at times," she was "stable for the most part" and was "working hard" and "still lik[ing her] job."  (AR 354.)  An October 2007 note states that Thompson reported that "work, home[, and] relationship[s]" were "all stable, happy[, and] secure."  (AR 355.)  A November 2007 note states that Thompson "report[ed] a good T[hanks]giving" and a "very stable month," and that Thompson was "maintaining stable employment/residence/relationships."  (AR 353.)  A January 2008

---

[2]  In contrast, Thompson's legal problems ranked at a "5."  (*Id.*)

note states that Thompson reported having a "happy holiday" and "managing [her] anger/impulsivity very well."  (AR 352.)  When she was discharged from CMC in January 2008, she was assigned a Global Assessment of Functioning ("GAF")[3] score of 75, which generally indicates that "[i]f symptoms are present, they are transient" and the individual has "no more than slight impairment in social, occupational, or school functioning."  DSM-IV-TR at 34.

Treatment records from Nurse Wilk, Dr. Southworth, and Dr. Rayfield also generally show benign clinical findings on examination, including good grooming and eye contact, normal pace and tone of speech, logical and coherent process, no psychosis, good judgment and insight, and normal cognition.  (*See, e.g.*, AR 433, 444, 509–10, 537, 561, 581.)  Dr. Southworth stated in a February 2009 treatment note that he was "hopeful that [Thompson] has fairly uncomplicated panic disorder, despite the legal history and concerns about substances."  (AR 445.)  In the same note, Dr. Southworth stated that Thompson was "very anxious to have me support her not going to work currently."  (AR 444.)  Over a year later, in May 2010, Nurse Wilk similarly stated in a treatment note that Thompson was "very anxious to have me support her not going to work currently."  (AR 541.)

---

[3]  "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d 260, 262, n.1 (2d Cir. 2008) (quoting *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 32 (4th ed. 2000)).

Finally, substantial evidence supports the ALJ's finding that Thompson was able to engage in regular daily activities which are "inconsistent with disabling mental impairments." (AR 25.) The ALJ explained:

> The record . . . documents other inconsistencies, which further undermine [Thompson's] credibility. [Her] mother testified that she can leave the house to shop, whereas [Thompson] herself claims that she never leaves the house to get necessities. Further, the record reveals that [Thompson] was able to travel to Florida for a week in January 2011, during which time she reported having no anxiety and eating and sleeping well, contrary to her testimony. A person who suffers from so much anxiety that she cannot even leave the house to grocery shop is grossly different than a person who is able to travel via airplane with many other people and manage a weeklong vacation without any problems.
>
> To [Thompson's] work history, she has engaged in work activity after her alleged onset date, working as a fast[-]food worker, housekeeper, flower picker, and cashier between 2005 and 2008. In June 2007, it was noted that [she] was doing well holding down two jobs and she moved into a new apartment alone. Further, treatment notes indicate some work activity as a housekeeper in November 2010. [Thompson's] ability to perform work activity after the alleged onset date further undermines her credibility.

(*Id.* (citations omitted).) The record supports this analysis, demonstrating that, although Thompson was limited in her ability to engage in many daily activities as a result of her mental impairments (*see, e.g.*, AR 70–72, 282–88, 295, 299–300), she was not as limited as she claims (*compare, e.g.*, AR 43 (Thompson's mother testifying that Thompson goes shopping) and AR 72 (Thompson testifying that she never goes shopping)). Specifically, although Thompson claims she rarely leaves her home due to very severe agoraphobia and panic attacks (*see* AR 61–65, 70–72), a treatment note from May 2010 states that five lorazepam pills were prescribed for Thompson, for use over a one-month period, "as it helps her leave the house for errands" (AR 541). Moreover, as noted by the ALJ, a

treatment note from February 2011 reveals that Thompson traveled to Florida for a one-week vacation and "had no anxiety on the plane."  (AR 581.)  While in Florida, Thompson "slept well, ate well, [and] enjoyed things."  (*Id.*)  The note states that Thompson was "a little anxious at [the] airport[,] but ok" (*id.*), whereas Thompson testified at the administrative hearing that being at the airport "was really overwhelming and really, really stressful" (AR 73).  Also, and as noted by the ALJ, contrary to Thompson's testimony at the administrative hearing that she did virtually nothing all day (AR 70–72),[4] October 2011 therapy notes indicate that she "fix[ed] up a house together" with her boyfriend (AR 605), "helped her mother with bills" from an early age (AR 606), "help[ed] her boyfriend with paperwork" (*id.*), had reconnected with a female friend, and "[wa]s working on [a] new house"  (AR 609).

For these reasons, I conclude that substantial evidence supports the ALJ's credibility assessment.  Although Thompson attempts to explain her testimony and other statements in a light more favorable to her claim (*see, e.g.*, Doc. 18 at 5), the ALJ was not obliged to accept Thompson's characterization of the record without question.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("[ALJ] is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.")  It is the task of the ALJ, and not the court, to resolve evidentiary conflicts and

---

[4]  Thompson testified that she cannot work because she "can't be around people" (AR 61); she is "scared of going out around people [and] places" (AR 62); she "can't even get gas in [her] car because [she] ha[s] a fear of being in there" (AR 63); and she "do[esn't] leave [her] house" because of her fears (*id.*).

appraise the credibility of witnesses, including the claimant.  *See Carroll v. Sec. of Health and Hum. Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

## II.    The ALJ properly evaluated the medical opinions.

### A.    Dr. Rayfield

In June 2011, Thompson's treating psychiatrist, Dr. Rayfield, submitted a letter opinion stating that Thompson was "currently unable to work due to complications with anxiety, PTSD[,] and agoraphobia."  (AR 593.)  Dr. Rayfield further stated that she hoped Thompson's daily function would improve but she was "unable to put a limit on her duration of need at this time."  (*Id.*)  Thompson argues that the ALJ erred in affording little weight to these opinions.

Under the treating physician rule, a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993).  The deference given to a treating physician's opinion may be reduced, however, in consideration of other factors, including the length and nature of the physician's relationship with the claimant, the extent to which the medical evidence supports the physician's opinion, whether the physician is a specialist, the consistency of the opinion with the rest of the medical record, and any other factors "which tend to . . . contradict the opinion."  20 C.F.R. § 404.1527(c)(2)–(6); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  If the ALJ gives less than controlling weight to a treating physician's

17

opinion, he must provide "good reasons" in support of that decision. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (internal quotation marks omitted).

Acknowledging that Dr. Rayfield was Thompson's treating psychiatrist, the ALJ gave "little weight" to her opinions on the following grounds: (1) they are conclusory, failing to include any specific functional limitations; (2) they make a finding of disability, an issue reserved to the Commissioner; and (3) they are unsupported by Dr. Rayfield's own treatment notes. (AR 25–26.) Each of these reasons constitutes a "good reason" to afford less than controlling weight to Dr. Rayfield's opinions, and each is supported by substantial evidence. First, the opinions are conclusory and do not list any practical, functional consequences of Thompson's mental impairments, stating merely that "complications with anxiety, PTSD[,] and agoraphobia" have caused her to be unable to work. (AR 593.)

Second, Dr. Rayfield's opinions make a finding on the ultimate question of disability, stating that Thompson "is currently unable to work," which is an issue reserved to the Commissioner. (*Id.*) The regulations provide that "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work,'" 20 C.F.R. § 404.1527(d)(1), is not a medical opinion but an "opinion[] on [an] issue[] reserved to the Commissioner because [it is an] administrative finding[] that [is] dispositive of [the] case; i.e., that would direct the determination or decision of disability," *id.* at § 404.1527(d). *See Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (holding that doctor's opinion that claimant was "'temporarily totally disabled'" was entitled to no weight, "since the ultimate issue of disability is reserved for the Commissioner"); SSR 96-5p,

1996 WL 374183, at *2 (July 2, 1996) ("treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance[, as g]iving controlling weight to such opinions would . . . confer upon the treating source the authority to make the . . . decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled").

Third, substantial evidence supports the ALJ's finding that Dr. Rayfield's opinions are unsupported by her own treatment notes. Although Dr. Rayfield's treatment notes indicate that Thompson complained of anxiety, panic attacks, and difficulty being around people and exhibited a tearful, anxious, and irritable affect; they also record that Thompson exhibited good grooming and eye contact, normal speech and cognition, and good insight and judgment. (*See, e.g.*, AR 537, 561, 581.) Moreover, as discussed above, notes from Dr. Rayfield's office indicate that Thompson consistently missed or was late for appointments and otherwise failed to comply with treatment recommendations, including therapy. (*See, e.g.*, AR 537, 559, 562, 579–80, 598.) When Thompson complied with treatment recommendations, Dr. Rayfield's notes indicate that she improved. (*See, e.g.*, AR 581 ("doing better, calmer, the clonazepam is working, not having much panic attacks"; "Good Mood; Cheerful Affect: polite, smiles[,] and [displays] appropriate concern"; "Affect: engaged, brighter[,] and fuller, less anxious and less labile than at last app[ointment,] calmer").)

Accordingly, I find that the ALJ's analysis of Dr. Rayfield's opinions was legally proper and supported by substantial evidence.

19

### B.      Counselor Findlay

I also find no error in the ALJ's analysis of counselor Findlay's opinions and treatment notes.  Thompson began treating with Findlay in October 2011.  (AR 605.)  At that time, Findlay completed a "Clinical Assessment and Diagnosis" worksheet regarding Thompson, finding that Thompson had "[m]oderate" problems with concentration, depression/anxiety, memory, self-esteem, going out in public, and sleeping; and "[s]evere" problems with panic attacks.  (AR 605–06.)  Findlay diagnosed Thompson with generalized anxiety disorder, PTSD, and rule-out bipolar disorder.  (AR 607.)

The ALJ did not specifically state in his decision what weight he afforded to Findlay's assessment because he found that it was not submitted to the ALJ in a timely manner, and Thompson's representative "failed to provide any reasonable basis for the delay and . . . did not ask for any additional time to submit records at the hearing."  (AR 17–18; *see* AR 36–39.)  Thompson argues that the ALJ erred in declining to admit the assessment into evidence.  But despite the ALJ's statement quoted above, the ALJ did in fact admit Findlay's assessment and treatment notes into the record, and considered them in his decision.  (*See* AR 18 ("Some of the subsequently submitted evidence, most notably the October 2011 clinical assessment and diagnosis by treating counselor Heather Findley, LCMHC, can be found in the record at Exhibit 22F."), 21–25 (ALJ referencing Exhibit 22F in several portions of his decision), 37–38 (ALJ receiving Findlay's assessment and notes into evidence as Exhibit 22F at the administrative hearing), 603–12 (Exhibit 22F, Findlay's assessment and notes).)

20

Equally significant, Findlay's assessment was completed after only one therapy session with Thompson, and is based almost exclusively on Thompson's own subjective reporting of her symptoms, which the ALJ reasonably found to be exaggerated, as discussed in detail above.  Further, the ALJ's RFC determination accounts for the limitations contained in Findlay's assessment, including for example, avoiding working with the pubic, working generally by herself and in a predictable and structured setting, and "need[ing] to be off[] task two.to three times per day by herself [for] between two and fifteen minutes" due to her panic attacks.  (AR 22.)  Also noteworthy, Findlay is a licensed clinical mental health counselor, not a physician; and, having met with Thompson on only one occasion when she prepared the assessment, she was not in a treating relationship with Thompson.  Therefore, the ALJ was not required to follow the "treating physician rule," discussed above, in his analysis of her assessment.  *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("only 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight"); 20 C.F.R. § 404.1513(a) (defining "[a]cceptable medical sources" to include only licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists); *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("while the ALJ is certainly free to consider the opinions of . . . 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician"); *see also Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a "treating physician" as a physician "who has or had an ongoing treatment and physician-patient relationship with the

21

individual"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians).

Thompson has attached to her Motion as Exhibit A an additional document prepared by counselor Findlay: a letter dated October 22, 2012 which states that Findlay provided treatment for Thompson on three occasions, summarizes Thompson's reported symptoms, and concludes that these symptoms "interfered with [Thompson] leaving the house and attending to tasks consistently." (Doc. 11-1, Ex. A.) The letter further states that, in Findlay's opinion, "[Thompson's] level of functioning would not have allowed her to attain and then maintain steady employment." (*Id.*) This letter was not submitted to the ALJ before the January 2012 administrative hearing or before the ALJ issued his decision in February 2012. It appears that Thompson's representative submitted the letter to the Appeals Council sometime around April 2012. (AR 323–24.) The Appeals Council found that the letter did not meet the criteria for consideration under 20 C.F.R. § 405.401(c), and thus did not consider it. (AR 2.) The Council also noted that, of the three therapy sessions referenced in Finlay's October 2012 letter, two of them "are already contained in the actual treatment records of record." (*Id.* (citing Ex. 22F, 603–12).)

Thompson argues that the Appeals Council erred in finding that Findlay's October 2012 letter did not provide a basis for changing the ALJ's decision. The Social Security Act provides that a court may remand a case to the Commissioner to consider additional evidence "only upon a showing that there is new evidence which is material and that

there is good cause for the failure to incorporate such evidence into the record in a prior

proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized this three-

pronged requirement as follows:

> [The claimant] must show that the proffered evidence is (1) "new" and not
> merely cumulative of what is already in the record, and that it is (2)
> material, that is, both relevant to the claimant's condition during the time
> period for which benefits were denied and probative. The concept of
> materiality requires, in addition, a reasonable possibility that the new
> evidence would have influenced the [Commissioner] to decide claimant's
> application differently. Finally, claimant must show (3) good cause for her
> failure to present the evidence earlier.

*Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (internal citations and quotation marks

omitted); *see also Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43, 45 (2d Cir.

1991).

Here, although Findlay's letter contains some "new" material, it is also cumulative

of the documents included in the record as Exhibit 22F, which constitute or reference

Thompson's two October 2011 therapy sessions with Findlay. Moreover, Thompson has

not presented good cause for her failure to present the letter sooner. Finally, it is unlikely

the ALJ would have decided Thompson's claim differently had he been in possession of

Findlay's October 2012 letter. This is because: (1) as noted above, Findlay is a mental

health counselor, not a physician, and thus the ALJ was not required to evaluate her

opinions in the same manner required under the treating physician rule, *Genier*, 298 F.

App'x at 108; (2) the principal opinion contained in Findlay's October 2012 letter—that

Thompson's level of functioning "would not have allowed her" to work—is vague,

stopping short of stating that Thompson's impairments in fact *did not allow* her to work

during the relevant period (Doc. 11-1, Ex. A); and (3) the opinion is on an issue reserved to the Commissioner, and thus, as discussed above regarding Dr. Rayfield's opinions, it is entitled to no weight, *see Taylor*, 83 F. App'x at 349; SSR 96-5p, 1996 WL 374183, at *2. Accordingly, I find that the Appeals Council did not err in finding that Findlay's October 2012 letter did not provide a basis for changing the ALJ's decision. *See Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) ("The concept of materiality requires . . . a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently."); *O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014) (quoting *Tirado* and holding that district court properly found claimant's new evidence immaterial).

### C.    Agency Consultants

The ALJ gave "significant weight" to the opinions of agency consultants Dr. Edward Schwartzreich and Dr. Ellen Atkins. (AR 26.) Drs. Schwartzreich and Atkins opined in June and November 2010, respectively, that, despite her mental impairments, Thompson could understand and recall one- to three-step instructions; could sustain attention, persistence, and pace for two-hour periods in a calm, predictable workplace; would do best working alone or with only one or two people; should not work with the public; and should avoid undue work changes or stressors. (AR 480, 534–35.) The ALJ explained that, although these consultants never personally examined Thompson, their opinions "are generally consistent with the treatment notes of record," and they "provide a function[-]by[-]function analysis of [Thompson's] limitations." (AR 26.) The ALJ also noted that Drs. Schwartzreich and Atkins reviewed "a significant portion of the medical

evidence of record," and their opinions are consistent with those of consultative examiner Richard Root, Ed.D. (*Id.*)

Although in many cases it is most appropriate for the ALJ to give less weight to the opinions of non-examining agency consultants than to those of treating physicians, this determination must be made on a case-by-case basis, and the regulations clearly permit the opinions of non-examining agency consultants to override those of treating sources, when the former are supported by evidence in the record and the latter are not. *See* SSR 96-6p, 1996 WL 374180, at *3 (1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); 20 C.F.R. § 404.1527(e)(2)(i) ("State agency . . . psychological consultants . . . are highly qualified . . . medical specialists who are also experts in Social Security disability evaluation."). Here, as discussed above, I find that the opinions of Dr. Rayfield and counselor Findlay are not supported by the record. On the other hand, I find that the opinions of consultants Drs. Schwartzreich and Atkins are consistent with the record, which documents that, despite Thompson's significant mental impairments, she was able to do work on a new house, complete paperwork for her boyfriend, help her mother with bills, take a trip to Florida, and engage in work activity. As the ALJ noted, the consultant opinions are also consistent with the May 2010 Psychological Evaluation of Dr. Root, which states that Thompson had significant panic attacks with agoraphobia, anxiety, and depressive symptomatology. (AR 475.) Thompson argues that Dr. Root's opinions conflict with those of the non-examining agency consultants and support a more limited RFC than the ALJ determined. But Dr.

Root's opinions on their own say little about the functional impact of Thompson's mental impairments and rely heavily on Thompson's self-reporting, which the ALJ reasonably discredited, as discussed above.  (AR 474–75.)  Drs. Schwartzreich and Atkins, experienced medical specialists, considered Dr. Root's Evaluation in making their opinions (AR 494, 529), and Thompson has pointed to no error in the ALJ's reliance thereon.

**III.    The ALJ's RFC determination is supported by substantial evidence.**

Thompson asserts that the ALJ's RFC determination is not supported by substantial evidence, as it fails to reflect her limitations arising from anxiety disorder, panic disorder with agoraphobia, and attendance and concentration problems.  Given that substantial evidence supports the ALJ's credibility assessment and analysis of the medical opinions, I find no error.  The ALJ took into consideration Thompson's limitations by tailoring the RFC to allow for no work with the public, only minimal work with coworkers and supervisors, and up to three 15-minute breaks each day.  (AR 22.)  *See Prince v. Astrue*, 490 F. App'x 399, 400–01 (2d Cir. 2013).

Thompson argues that the ALJ's RFC determination should have accounted for her alleged need for three 15-minute unscheduled breaks each day, *in addition to normal scheduled breaks*, due to her panic attacks.  (Doc. 11 at 16–17.)  In support of this argument, Thompson cites to the VE's testimony at the administrative hearing that it is generally not acceptable for an employee to take up to three 15-minute breaks per day, in addition to the "normally acceptable coffee [breaks] and lunch hours."  (AR 82.)  But the ALJ did not determine that Thompson required three breaks a day, *in addition to*

*regularly scheduled breaks*; rather, the ALJ found that Thompson required up to three breaks lasting up to 15 minutes each—*in total*—over the course of a workday.  (*See* AR 22.)  The ALJ even interrupted cross-examination of the VE at the administrative hearing to clarify this issue, stating:  "I'm going to interject.  This is your own hypothetical at this point.  I don't think that your characterization of . . . what I said is accurate."  (AR 81–82.)  The ALJ further stated in his decision that "the record contains very little objective medical support for [the] high rate of panic attacks [alleged by Thompson]."  (AR 24.)  As discussed above, substantial evidence supports this finding.

It is clear from the ALJ's decision that he considered the record as a whole in determining Thompson's RFC, *see* 20 C.F.R. § 404.1545(a)(1) (ALJ must assess claimant's RFC "based on all the relevant evidence in [the] case record"), and properly determined the RFC in conjunction with assessing Thompson's credibility, *see Poppa v. Astrue*, 569 F.3d 1167, 1170–71 (10th Cir. 2009).  As the Tenth Circuit explained:

> The regulations require that an ALJ's RFC be based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints.  *Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.*

*Id.* (emphasis added) (citing 20 C.F.R. §§ 416.929, 416.945); *see also Sitsler v. Astrue*, 410 F. App'x 112, 120 (10th Cir. 2011) ("A proper determination of the weight to be given claimant's subjective claims of pain and other symptoms underlies a proper finding regarding his RFC.").

**IV.    The ALJ did not err in finding that Thompson was capable of performing her past relevant work.**

Lastly, Thompson contends the ALJ erred in his step-four finding that, based on the ALJ's RFC determination and testimony from the VE, Thompson was capable of performing her past relevant work as a housekeeper.  (AR 26–27.)  Thompson contends this finding is not supported by substantial evidence because the ALJ's RFC determination does not accurately reflect her mental limitations.  Given that I find no error in the ALJ's RFC determination, credibility assessment, and analysis of the medical opinions, Thompson's argument fails.

**Conclusion**

As explained above, where substantial evidence supports the ALJ's findings, the decision to discount subjective testimony may not be disturbed on judicial review. *Aponte*, 728 F.2d at 591; *see Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable.") (internal quotation marks omitted).  Here, the ALJ's decision hinges largely on his assessment that Thompson's allegations of total disability are "less than credible."  (AR 23.)  I find that the ALJ properly assessed Thompson's credibility, and that substantial evidence supports that assessment.  I also find that the ALJ's RFC determination and finding that Thompson could perform her past relevant work are supported by substantial evidence.  Further, I find that the ALJ did not err in his analysis of the medical opinions.  Therefore, I

recommend that Thompson's motion (Doc. 11) be DENIED, the Commissioner's motion

(Doc. 14) be GRANTED, and the decision of the Commissioner be AFFIRMED.

 Dated at Burlington, in the District of Vermont, this 16th day of October, 2014.


       /s/ John M. Conroy    
       John M. Conroy
       United States Magistrate Judge



Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).